COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | |
|---|---|---|
| MICHAEL MONROE BOWERS, | § | No. 08-13-00346-CV |
| Appellant, | § | Appeal from the |
| v. | § | 231st Judicial District Court |
| ANGELA GODBEY BOWERS, | § | of Tarrant County, Texas |
| Appellee. | § | (TC# 231-485220-10) |
| | § | |

# **O P I N I O N**

Nearly a year after signing an agreed divorce decree that gave his wife $2.1 million in community assets and left him with almost $360,000 in debt, Appellant Michael Monroe Bowers purportedly came out of what he described as a "love sick fog." He filed for two bills of review in Tarrant County court,[1] alleging fraud and seeking to reopen divorce proceedings and void a post-nuptial agreement he signed. The trial court granted summary judgment and attorney's fees to his ex-wife, Dr. Angela Bowers-Plott.[2] Because we find material fact disputes related to whether Michael acted negligently during the original divorce proceedings, we reverse and remand for a merits hearing. We also vacate the temporary orders awarding attorney's fees to

---

[1] We received this case on transfer from the Second Court of Appeals in Fort Worth and apply that court's precedent here.

[2] In its summary judgment order, the trial court referred to Angela both by this name and by her previous name, Angela Godbey Bowers. We will refer to the parties in this opinion as Michael and Angela.

Dr. Bowers-Plott.

## BACKGROUND
### *Factual History*
### Marriage, Business Ventures, and the Couple's Finances

Michael and Angela married on February 7, 1998 after meeting through church in Dallas. At the time, Angela was a dermatology resident at the University of Texas Southwestern Medical School in Dallas. Michael co-owned and operated a business called Coupralux. Both Michael and Angela described themselves as devoutly Christian and maintained that religion was a key component of their marriage. Angela said that "divorce was not in [her] vocabulary."

Michael testified that he made between $50,000 and $60,000 a year at Coupralux before post-2001 economic conditions caused the business to lose money. For several years thereafter, Michael drew no paycheck from Coupralux. Eventually, Michael was able to make between $20,000 and $25,000 a year from the business. Meanwhile, Angela established her private practice, Southlake Dermatology, with Michael's assistance. The dermatology practice became very successful. Angela earned between $900,000 to $1 million a year by 2007.

Together, the couple had two children. Michael and Angela divided up marriage duties, with Michael being responsible for housework and maintenance and Angela managing the couple's finances. Many of the couple's assets, were held in a trust ("the Bowers Living Trust") that originally named both Michael and Angela as trustees. Michael testified that he did not have access to the accounts, but that he trusted his wife to manage the finances.

Coupralux's business troubles continued throughout the mid-2000s and caused strain in the marriage and on the couple's finances. In late 2007, Coupralux obtained a $360,000 loan from Bernstein Investments secured by the couple's assets in the Bowers Living Trust. In December 2007, Michael and Angela began discussing Michael's status as a trustee of the

2

Bowers Living Trust, and their trust attorney Alan Duncan apparently advised Michael that removing his name from the retirement accounts and amending the trust terms would help insulate the couple's assets from liability in the event Coupralux failed.

### Michael's Revelations and the Post-Nuptial Agreement

On January 28, 2008, after speaking with a former medical school colleague who had written a book on pornography addiction, Angela confronted Michael and asked if he had ever viewed pornography. Michael admitted that he had. After Michael admitted this, Angela told him that she could no longer trust him, and she asked him to sign a post-nuptial agreement in order to regain her trust. She testified in deposition that she considered pornography use to be a form of adultery, that it made her feel worried that he would go on to have an affair, and that the post-nuptial agreement was the only way she could secure her assets in the event Michael did have an affair and the couple then divorced.

Angela met with attorney Heather King, who represented her during the post-nuptial negotiations and drafted the agreement. Separately, on February 18, 2008, Angela e-mailed Duncan, the couple's trust attorney, stating "I just want to make sure that in case of a divorce that I have full control of the Living Trust which would enable me to change it without his signature, etc. I want to ensure that it doesn't get split in half between the two of us." On February 21, Angela e-mailed Michael a copy of the proposed post-nuptial agreement, writing, "I just want to reassure you that this agreement is not to try and get back at you or anything like that. It will help me move forward and feel confident that we will never have to use such a thing."

On April 11, King sent Angela a revised post-nuptial agreement, told Angela that Michael should have his own lawyer, and recommended that attorney Barbara Nunneley represent Michael. Angela relayed the draft and Nunneley's contact information on to Michael

3

on April 15 and offered to pay for Nunneley's services. On April 30, Michael met with Nunneley to discuss the post-nuptial agreement. Michael stated in an affidavit that the meeting lasted fifteen minutes, and that he had no other discussion with the attorney either before or after that meeting. He did not read any of the post-nuptial agreement drafts, but Nunneley did sent him a letter confirming that she had explained the ramifications of the agreement to him and that he wished to sign the post-nuptial agreement.

Michael and Angela signed the post-nuptial agreement on May 7, 2008. In broad terms, the agreement gave Angela all real properties, furnishings, the rights to her businesses, her 2007 Audi, and several bank accounts, all totaling about $2.1 million. Michael received his own personal property, Coupralux's $390,000 debt, an IRA worth $1,500, and a bank account worth $2,000. Angela testified in deposition that she believed this represented an even split because she received everything attributable to Southlake Dermatology and Michael received everything from Coupralux. At the time he executed the post-nuptial agreement, Michael also signed away his rights as trustee of the Bowers Living Trust, leaving Angela as sole trustee. During this period, the couple was in marriage counseling, and Michael was on psychiatric medication for depression and anxiety. Michael's family expressed concerns that he was possibly suicidal.

**Divorce and Aftermath**

Michael and Angela's marriage continued to deteriorate over the coming months.

On January 6, 2009, Angela e-mailed the couple's marriage counselor, and told her that she intended to file for divorce from Michael and wanted to bring it up at a session. She wrote:

> I would like to suggest that the divorce will help eliminate the risk of losing more money and provide us a clean slate. I also would like to suggest to Mike that we not tell anyone of the divorce since it is more a legality to help provide asset protection. We would continue to treat the relationship as a separation. . . . We can always get remarried once I know in my heart that his word stands. His yes is yes and his no is no. Once I trust Mike that he will honor any commitment he

4

makes I will be interested.

Michael testified at a meritorious defense hearing that Angela told him her bankruptcy attorney had advised her to get a "technical" divorce that would shield their assets from liability. He also testified that Angela had told him to keep the divorce secret. Angela filed for divorce on January 7. For the next two months, Michael continued to live separate from Angela at his parents' house, but he testified that he still performed household chores and provided technical assistance to Southlake Dermatology. Michael signed an Agreed Decree of Divorce on March 9.

A week after the divorce was final, Angela signed up for an account on the dating web site eHarmony.com and began meeting other men. Eleven days after the divorce, Angela sent Michael an e-mail on March 20, stating, in relevant part:

> I have moved forward with my life of being a single mother. I know that God is leading. I am very very doubtful that we will ever be a couple again. You are 40 yo [sic]. How on earth do I expect you to change now? You've been talking about change for 2.5 years but things just go worse. I have accepted reality though my childhood dreams of being married for life are crushed. In case you are hoping that I will concede and let you move back in since you have a problem with dealing with reality I just want it to be very clear to you that it will not happen. Even if God lays his hand on my heart, erases the past, and changes you into a person I would marry, it would realistically take at least a year.

> .　　　.　　　.

> Your past actions took me out of the 'divorce silently and work on the separation' to just be done with it and move on. I was tired of being dragged down.

> .　　　.　　　.

> I put my heart and soul into restoring the marriage and have been able to accept the outcome knowing that I did everything within my power and resources. I gave it all I had. I cannot be the wife that you want.

The trial court's plenary power to entertain a motion for new trial in the divorce expired on April 8, thirty days after the divorce decree was issued. *See* TEX.R.CIV.P. 329b(a). Michael's ability to appeal the divorce decree also expired on April 8, thirty days after entry of judgment,

5

given that he failed to file any motion that would extend the appellate timetables. *See* TEX.R.APP.P. 26.1.

On April 24, Angela sent Michael another e-mail in which she said, "I am moving on. I lost all hope for a marriage with u [sic]. You had 2.5 years to respond but only now are since we divorced [sic]. When I review all the terrible things you put me thru I can't believe I held out as long as I did." On May 16, Angela sent Michael an e-mail saying "I cannot be your wife. It is over. I should have never been put in the position of having to ask for a separation to begin with." She also said, "I am dating. I would like to remarry." Angela admitted in deposition that it was her hope that Michael would change after she filed for divorce, but that she gave up on that hope for reconciliation on May 11, when she set up a date with Dr. Todd Plott, a fellow dermatologist. In November 2009, Angela married Todd Plott.

### *Procedural History*

On March 26, 2010, almost one year after the trial court entered judgment on the agreed divorce decree, Michael brought two suits for bills of review, seeking to reopen divorce proceedings and vacate the declaratory judgment rendering the post-nuptial agreement valid and enforceable. The trial court consolidated the suits into the single action at bar. The trial court then held a *Goldsmith*[3] hearing and ruled that Michael established prima facie evidence of a meritorious defense.

Angela moved for partial hybrid summary judgment on March 22, 2012. The trial court denied that motion on June 12, 2012. Subsequently, Angela filed two partial hybrid motions for summary judgment—one attacking the bill of review on the divorce decree, and the other, the bill of review on the declaratory judgment. Angela did not challenge the meritorious defense or fraud elements of the bill of review, but contended only that Michael provided no evidence that

---

[3] *Baker v. Goldsmith*, 582 S.W.2d 404 (Tex. 1979).

6

his injury was unmixed with his own negligence or fault.[4]  Following a hearing, both Michael

and Angela provided post-submission supplements to their summary judgment pleadings, which

the trial court reviewed and considered.  The trial court issued a general summary judgment

order in favor of Angela that did not specify upon which grounds its decision rested.  Michael

appealed.

While this appeal was pending, Angela moved for a temporary order awarding attorney's

fees in the trial court under TEX.FAM.CODE ANN. §§ 6.709(a) & 109.001 (West 2006 &

2014)(allowing the trial court to issue temporary orders in the event of an appeal from a divorce

decree or SAPCR[5] judgment).  The trial court granted a temporary order awarding Angela

$70,000 in attorney's fees if Michael pursued an unsuccessful appeal, with remittiturs made if he

failed to file petitions of review with the Texas Supreme Court or the Texas Court of Appeals.

The order also stated that if he chose not to appeal at all, the attorney's fee award would be

vacated.

## DISCUSSION

Michael advances four issues on appeal attacking the trial court's summary judgment and

temporary orders.  We divide our opinion accordingly, addressing his bill of review arguments

first before turning to the issue of attorney's fees.

## I.
### BILL OF REVIEW

In Issue One, Michael contends that the trial court erred by granting summary judgment

instead of proceeding to a merits hearing because he raised preclusive fact issues on the "lack of

---

[4] Although Angela characterized the motion as a hybrid summary judgment raising no-evidence and traditional challenges, our review of the motion filed in the trial court shows no distinction between the grounds and treats the subject largely as a no-evidence challenge on a single element of the bill of review.

[5] Suit affecting the parent-child relationship.

7

negligence" element of the bill of review. We agree.

### *Standard of Review*

Although bills of review are ordinarily reviewed for abuse of discretion, because the trial court granted summary judgment in this case, here the proper standard of review is the summary judgment standard. *Clarendon Nat'l Ins. Co. v. Thompson*, 199 S.W.3d 482, 487 (Tex.App.--Houston [1st Dist.] 2006, no pet.); *D'Unger v. Woolsey*, No. 13-04-110-CV, 2006 WL 871561, at *1 (Tex.App.--Corpus Christi Apr. 6, 2006, no pet.)(mem. op.).

We review summary judgment grants *de novo*. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). When a party moves for summary judgment on hybrid no-evidence and traditional grounds, we address the no-evidence grounds first before turning, if necessary, to the traditional grounds. *Id*. "A no-evidence summary judgment motion under Rule 166a(i) is essentially a motion for a pretrial directed verdict[.]" *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). To survive no-evidence summary judgment, the nonmovant must produce "more than a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element of the claim." *Beinar v. Deegan*, 432 S.W.3d 398, 412 (Tex.App.--Dallas 2014, no pet.). "When reviewing a no-evidence summary judgment, we review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Timpte Indus., Inc.*, 286 S.W.3d 310 [Internal quotations marks omitted].

If the nonmovant survives no-evidence summary judgment, we then review the case under the traditional summary judgment standard. *Merriman*, 407 S.W.3d at 248. "[Traditional] [s]ummary judgment is proper when the movant shows by uncontroverted or conclusive

summary judgment evidence that no issue of material fact exists and that [he] is entitled to judgment as a matter of law." *Lawrence v. Lawrence*, 911 S.W.2d 443, 446 (Tex.App.--Texarkana 1995, writ denied). Where a nonmovant survives both no-evidence and traditional summary judgment, we must reverse and remand for trial.

## *Analysis*

This case presents the quintessential problem of appellate review in situations where the trial court grants summary judgment on an equitable claim instead of denying the claim on the merits. We pause briefly to clarify the scope of the issues brought before us in this contentious appeal. We are not in a procedural position to resolve factual disputes or weigh the equities of the underlying bill of review. Rather, we are tasked only with viewing the record evidence through the prism of summary judgment and deciding whether there were material fact disputes that should have been resolved on the merits. Further, because Angela explicitly disavowed any challenges on the basis of fraud in her motion for summary judgment, the scope of our review is further winnowed down to only the issue of whether Angela proved a double negative: that Michael offered no evidence that he was not negligent or at fault. Bearing these things in mind, we proceed.

## Applicable Law

"A bill of review is an independent action to set aside a judgment that is no longer appealable or subject to challenge by a motion for new trial." *Wembley Inv. Co. v. Herrera*, 11 S.W.3d 924, 926-27 (Tex. 1999). The courts do not look upon bills of review favorably, as our justice system has a strong interest in ensuring that controversies are permanently settled at one time and that litigants will not resurrect dead cases for purposes of harassment, or simply because they later regret not raising certain issues when they had the chance. However, the

courts also have an equitable interest in justice, and ensuring that fraud does not taint and vitiate "even the solemn judgment[s] of courts of record." *DeCluitt v. DeCluitt*, 613 S.W.2d 777, 780 (Tex.Civ.App.--Waco 1981, writ dism'd). As such, bills of review exist to provide a failsafe against manifest injustice and the wrongful deprivation of a litigant's right to trial and appeal in extraordinary circumstances. *Id.*

Injustice alone is an insufficient basis to grant a bill of review. *Wembley Inv. Co.*, 11 S.W.3d at 927. A litigant may receive a bill of review and set aside a judgment only where he shows he "has exercised due diligence in pursuing all adequate legal remedies against a former judgment and, through no fault of [his] own, has been prevented from making a meritorious claim or defense by the fraud, accident, or wrongful act of the opposing party." *Id.* The Texas Supreme Court has broken the bill of review action down into three substantive elements: "(1) a meritorious defense to the cause of action alleged to support the judgment; (2) an excuse justifying the failure to make that defense which is based on the fraud, accident or wrongful act of the opposing party; and (3) an excuse unmixed with the fault or negligence of the petitioner." *Beck v. Beck*, 771 S.W.2d 141, 141 (Tex. 1989). To determine negligence or fault, we look to see "whether the litigant and his counsel used such care as that which prudent and careful men would ordinarily use in their own cases of equal importance." *In re A.L.H.C.*, 49 S.W.3d 911, 916 (Tex.App.--Dallas 2001, pet. denied).

### Adequate Alternative Legal Remedies?

As a threshold matter, Angela asserts that Michael cannot avail himself of a bill of review because he had adequate time to pursue alternate remedies to challenge the divorce action: namely, a motion for new trial or appeal within thirty days of the judgment, *see* TEX.R.CIV.P. 329b; TEX.R.APP.P. 26.1(a) or a restricted appeal within six months of judgment. *See*

TEX.R.APP.P. 26.1(c). We dispose of Angela's restricted appeal argument first. Restricted appeals are only available in default-type situations where the appealing party failed to participate in the hearing of the challenged proceedings. TEX.R.APP.P. 30. Because Michael agreed to the declaratory judgment rendering the post-nuptial agreement enforceable and because he agreed to the divorce decree, he was a participant in both judgment proceedings and could not use restricted appeal to correct the effects of any alleged, discovered fraud. *See De La Rocha v. Lee*, 354 S.W.3d 868, 872-73 (Tex.App.--El Paso 2011, no pet.)(appellant who had agreed to entry of judgment in conformance with a Rule 11 agreement was precluded from seeking restricted appeal because he had participated in the "decision-making event").

Angela is correct that Michael could have theoretically challenged either judgment by filing a motion for new trial or an appeal. *See Authorlee v. Tuboscope Vetco Int'l, Inc.*, 274 S.W.3d 111, 119 (Tex.App.--Houston [1st Dist.] 2008, pet. denied)(holding that granting a new trial on agreed judgment was proper only upon a showing of fraud, collusion, or misrepresentation); *Leeper v. Woodrick*, No. 2-04-371-CV, 2005 WL 1475614, at *2 (Tex.App.--Fort Worth June 23, 2005, no pet.)(mem. op.)(consent judgment waives all appellate complaints except jurisdiction unless judgment was obtained by "fraud, collusion, or misrepresentation"). Thus, the question becomes whether a reasonable person in Michael's shoes should have timely availed himself of these options as a matter of law.

**False Promises, Coercion, and Negligence**

In this case, Michael maintains that he agreed to the divorce because Angela told him it was necessary to protect the couple's assets, but that he believed they would get remarried once the assets were insulated from danger. Although the use of a bill of review to challenge a divorce secured by purported concerns about asset protection and false promises of reconciliation

11

is unusual, this fact pattern is not unique. In assessing Michael's actions, we are guided by a line of cases arising out of similar circumstances to the case at bar. In *Vickery v. Vickery*, No. 01-94-01004-CV, 1997 WL 751995 (Tex.App.--Houston [1st. Dist.] Dec. 4, 1997, pet. denied)(not designated for publication)(op. on reh'g), the husband, a successful attorney facing a malpractice suit in excess of his insurance limits, convinced his wife to divorce him in "secret," allegedly in order to shield the couple's assets from creditors in the event of an adverse judgment against him. *Id*. at *2-*3. According to the wife, her husband stated that the couple would remarry once the malpractice case against him was resolved and their assets were no longer in jeopardy. *Id*. at *3. The husband hired another attorney to file a divorce on his wife's behalf without first consulting the wife. The same attorney then filed the husband's answer and counterclaim. The wife testified that she signed the papers without reading them, and that the attorney her husband hired told her she was doing "the right thing" in order to protect the couple's assets. *Id*. At the final divorce hearing, only the husband and the attorney attended. *Id*. Once the divorce was final, the husband married his now ex-wife's best friend and then moved to have his ex-wife evicted from her residence per the divorce agreement terms. *Id*. The ex-wife filed for a bill of review.

At the bill of review trial, the wife testified that she believed her husband was telling the truth about reconciling even after the divorce decree was final, and even though prior to the entry of divorce the husband began expressing dissatisfaction with the marriage and the couple entered marriage counseling. *Id*. She maintained her only inclination the divorce was real came when she received the motion to enforce the divorce decree. *Vickery*, 1997 WL 751995, at *3. The trial court granted the wife's bill of review, reopened divorce proceedings, and re-divided the marital estate. The Houston First Court affirmed, holding that the evidence was legally and

12

factually sufficient to support the trial court's finding of fraud. *Vickery*, 1997 WL 75995, at *24-*25. It also held the evidence was legally and factually sufficient to support a finding that the wife was not negligent or at fault, in spite of the fact that the wife was a legal assistant who should have understood the legal process, in spite of the fact that she claimed "she did not read the divorce decree before signing it," and in spite of the fact she never called or wrote to the attorney her husband hired for her. *Id*. at *25.

The fact that *Vickery* proceeded to trial on the bill of review instead of ending in a directed verdict in the husband's favor stands as a clear refutation of the contention that this case was properly terminated under no-evidence summary judgment review for lack of a triable fact issue. *Cf. Timpte Indust., Inc.*, 286 S.W.3d at 310 (no-evidence summary judgment is the functional equivalent of a pretrial directed verdict for lack of legally sufficient evidence). The similarities between this case and *Vickery* are striking. Both involve a dispute between spouses as to whether one spouse represented that the divorce was an asset-protection maneuver that would be reversed later, or whether the divorce was actually done because the marriage had deteriorated. *Vickery* confirms that a spouse in a situation like this one presents a fact issue on fault that the trial court may properly resolve in their favor on the merits.

Further, while *Vickery*'s facts may be egregious, *Vickery* is part of a line of cases holding that a spouse who agrees to a divorce based on false promises of reconciliation can survive no-evidence summary judgment and present triable fault issues for a bill of review. In *McFarland v. Reynolds*, 513 S.W.2d 620 (Tex.Civ.App.--Corpus Christi 1974, no writ), the appellate court reversed the lower court's order striking bill of review pleadings a wife brought to reopen a divorce settlement she reached with her husband. The wife alleged that her husband secured her consent to the divorce through fraud, telling her that he was going to dismiss the divorce suit and

13

reconcile, but then on the date of the anticipated dismissal explaining that the divorce had to be finalized before reconciliation so that he could succeed in a lawsuit he had against a third party for alienation of the wife's affections. *McFarland*, 513 S.W.2d at 623-24. He promised that once the divorce decree was entered, he would remarry her two weeks later and their finances and relative interests in the community estates would return to status quo ante. *Id*. He never remarried his wife, and she sued after the divorce and property disposition became final and unappealable. *Id*.

After the trial court struck the pleadings for failing to state a claim, the Corpus Christi Court reinstated the pleadings and remanded for a trial on the bill of review, stating that "a determination of factual issues by the trier of facts is required by the record before us" because "[t]he record does not show unequivocally that appellant [the wife] is chargeable with fault or negligence which would conclusively bar her action for review of the disposition made of the community property in the divorce decree[.]" *Id*. at 626. *See also Maddux v. Brownen*, 759 S.W.2d 183 (Tex.App.--Waco 1988, writ denied)(finding that a husband whose wife divorced him but repeatedly said they would get remarried and then convinced him to dismiss an initial bill of review seeking to set aside the divorce and property dispositions presented fact issues that should have precluded summary judgment on a second bill of review, thereby implicitly finding fact question on husband's negligence).

Despite *Vickery*, *McFarland*, and *Maddux* suggesting that negligence or fault in situations like this almost always a fact issue, Angela maintains that several discrete actions Michael failed to undertake such as reading the agreement, filing for a new trial, or timely appealing the final judgment show he was negligent as a matter of law. But the case law she cites does not support the proposition that those actions categorically constitute negligence in

14

every case as a matter of law. *See Vickery*, 1997 WL 751995, at *25 (upholding merits finding that wife was not negligent even though she failed to read the divorce documents before agreeing to their terms). Rather, nearly all the cases she cites uphold the legal sufficiency of a trial court's finding of negligence in light of those factors following trial on the merits, i.e., after the parties presented a predicate triable issue in the lower court. *See*, *e.g.*, *Gone v. Gone*, 993 S.W.2d 845, 848 (Tex.App.--Houston [14th Dist.] 1999, pet. denied)(upholding negligence finding as legally sufficient); *Borgerding v. Griffin*, 716 S.W.2d 694 (Tex.App.--Corpus Christi 1986, no writ)(upholding trial court's merits finding that purported oral agreement between husband and wife to dispose of certain property and get remarried did not exist); *Innmon v. Mouser*, 493 S.W.2d 290 (Tex.Civ.App.--Austin 1973, no writ)(affirming merits denial of bill of review on negligence grounds). These cases do not directly address where the threshold for a triable issue on negligence is set at the front end of litigation.

In the specific context of bills of review attacking divorces, the case law Angela cites only supports the contention that a party who can objectively discover extrinsic fraud—for example, by auditing community assets to verify if another spouse's financial representations are correct—is precluded from raising a bill of review as a matter of law for negligence. *See*, *e.g.*, *Williamson v. Williamson*, 986 S.W.2d 379, 381 (Tex.App.--El Paso 1999, no pet.)(wife could not claim bill of review when due diligence review by her accountants could have objectively refuted husband's fraudulent representations of marital estate value); *Kennell v. Kennell*, 743 S.W.2d 299, 300 (Tex.App.--Houston [14th Dist.] 1987, no writ)(wife could not raise bill of review because she could have easily discovered that her husband's financial representations were false in the exercise of due diligence); *cf. Lawrence v. Lawrence*, 911 S.W.2d 443 (Tex.App.--Texarkana 1995, writ denied)(failure to prosecute appeal where trial court prevented

15

him from discovering wife's hidden assets in divorce proceeding constituted negligence).

But even that rule is not absolute. In *Rathmell v. Morrison*, 732 S.W.2d 6, 15-16 (Tex.App.--Houston [14th Dist.] 1987, no writ), the Houston Fourteenth Court of Appeals held there was legally sufficient evidence to establish that a wife was not negligent in foregoing an appraisal of her husband's companies before signing a divorce settlement because the husband had credibly threatened to shut down the companies, crash their value during divorce proceedings, and then re-open the companies once the divorce was final. *Id.*

Thus, even if *Vickery*, *McFarland*, and *Maddux* are not enough to establish that summary judgment is inappropriate in bills of review such as this where consent to divorce was allegedly secured past the point of appealability by false promises of reconciliation genuinely believed by the other spouse, *Rathmell* stands for the more general proposition that a spouse's coercive actions bear on the reasonableness of other spouse's decisions in pursuing bill of review alternatives, and that coercion can raise a fact issue on whether another spouse's failure to act was negligent even where due diligence would otherwise be required. *Accord Sanchez v. Sanchez*, No. 04-09-00477-CV, 2010 WL 3249905, at *3 (Tex.App.--San Antonio Aug. 18, 2010, no pet.)(mem. op. on reh'g)(recognizing that the *Rathwell* court considered coercion as a distinguishing factor in its negligence/fault analysis); *Hester v. Prickett*, No. 13-11-00677-CV, 2012 WL 3252721 (Tex.App.--Corpus Christi Aug. 9, 2012, pet. denied)(mem. op.)(reversing summary judgment in a bill of review divorce case because *Rathmell* establishes that threats coupled with fraudulent misrepresentations create a fact issue on the bill of review petitioner's negligence).

Here, regardless of whether the Court views the evidence under the *Vickery-McFarland* false promise approach or under the *Rathmell* coercion framework, there was enough evidence in

the record to raise a fact issue on whether Michael was negligent or at fault in light of his wife's actions. The evidence shows that Angela repeatedly expressed her concern to Michael that his business' potential failure would leave the couple's sizeable assets vulnerable, and Angela's e-mails to her therapist show that she intended to suggest the divorce to Michael only as a technical, legal maneuver aimed at shielding exposed assets. In fact, in e-mails she sent to Michael during post-nuptial negotiations, she went as far as to state that she did not intend for him to think the post-nuptial agreement was her trying to "get back" at him. Her desire to keep the divorce secret, coupled with Angela's use of Michael to perform household chores and technical assistance for her business after the divorce and both parties' personal and religious views and attitudes towards divorce, could have raised a fact issue on whether Michael's reliance on her promises of reconciliation and remarriage were reasonable under the circumstances. Further, Angela's use of Michael's pornography confession to extract a heavily one-sided post-nuptial agreement that would purportedly help him regain her trust raises a fact issue on coercion, which under *Rathmell* also raises a corresponding fact issue on whether any failure to perform due diligence on Michael's part was the result of his own negligence or Angela's coercion.

While these factors standing individually may not be enough to raise a fact issue on negligence, their combined force tips the scale away from summary disposal. In viewing the summary judgment record as a whole, it is clear there is enough evidence under both the traditional and no-evidence standards to raise a fact issue as to whether Michael was negligent or at fault in allowing the declaratory judgment and the divorce decree to be rendered against him.

Finally, Angela contends that even if Michael can raise fact issues on fault or negligence generally based on fraud or coercion, any illusions of reconciliation should have been dispelled

17

on March 20, 2009, eleven days after the divorce during the trial court's plenary period, when she sent Michael the e-mail set out above in this opinion. At that point, she asserts any beliefs he may have had about getting back together became unreasonable as a matter of law and Michael should have known that he needed to defend himself by filing a motion for new trial.

The parties clash over what Angela's March 20 e-mail truly meant, and this Court has struggled in parsing the words of Angela's e-mail and deciding whether it should have put Michael on notice that Angela no longer intended to reconcile, that the divorce was real, and that he should have immediately filed a motion for new trial within eleven days of the e-mail in order to extricate himself from the situation. In truth, we cannot and should not decide that question in light of the conflicting record before us. The e-mail Angela sent on March 20, 2009, is ambiguous, both when read in context of the record, and on its face. Although Angela makes clear that she will not merely concede to Michael, she also suggests that if Michael were to change, she would consider reconciling in a year. Angela confirmed in her deposition that at the time she sent that e-mail, she had not completely foreclosed the possibility of reconciliation, and did not foreclose on the possibility of reconciliation until she met her new husband.

Reasonable dispute over the meaning of Angela's e-mail suggests the existence of a triable fact on fault, and where reasonable people disagree as to what evidence means, it is not the role of either this Court or the trial court sitting on summary judgment review to decide that question conclusively; it is the role of the jury or fact finder. Summary judgment on this record was inappropriate.

We end this section with a caveat. This opinion should not be read as a wholesale rejection of summary judgment in bill of review proceedings challenging divorces, nor should it be read as an invitation for trial courts to grant more bills of review in divorce cases. Instead, we

18

simply hold that under this set of facts presented, Angela cannot establish Michael's fault or negligence as a matter of law. Outstanding fact issues need to be resolved on the merits.

Issues One, Two, and Three are sustained.

## II.
### ATTORNEY'S FEES

In Issue Four, Michael challenges the trial court's temporary order awarding attorney's fees on several grounds, contending both that the trial court lacked the authority to enter the order, and, alternatively, that the trial court abused its discretion in awarding attorney's fees. We agree that the trial court had no authority to enter the temporary orders because the trial court never had active divorce proceedings before it.

### *Appellate Jurisdiction*

At the outset, Angela argues we lack jurisdiction to review the temporary order on direct appeal, and that Michael can only test the temporary orders' validity through mandamus. We disagree.

Angela requested the temporary orders for attorney's fees under two separate provisions of the Texas Family Code: Section 109.001(c), governing the trial court's post-judgment powers during a pending SAPCR appeal; and Section 6.709, governing the trial court's same powers during divorce appeals. Angela is correct that several of our sister circuits have construed Section 109.001(c), which explicitly prohibits "interlocutory appeal" of a temporary order issued in a SAPCR appeal, as barring review of temporary orders ancillary to a SAPCR appeal and leaving only mandamus relief available. *See In re Garza*, 153 S.W.3d 97, 100 (Tex.App.--San Antonio 2005, orig. proceeding). Even so, we can review the question of whether the trial court actually relied on its Section 109.001 authority in entering the order. *Cf. Brejon v. Johnson*, 314 S.W.3d 26, 33 (Tex.App.--Houston [1st Dist.] 2009, no pet.)(determining on direct appeal, in

19

spite of interlocutory appeal ban, that temporary orders issued pending appeal under Section 109.001 were void because trial court lacked legal authority to issue them).

Here, Michael's live pleading only attacked the validity of the divorce order and the declaratory judgment, seeking modification of child custody terms contingent on his success in the bill of review setting aside the divorce judgment. Procedurally speaking, there was no actual pleaded SAPCR before the trial court at the time the trial court rendered judgment, only a bill of review that purported to attack a divorce decree and a declaratory judgment. Further, the trial court never reopened custody proceedings or altered the custody arrangement in any way. As such, the trial court could not have relied on Section 109.001(c) SAPCR authority to grant temporary orders. Section 109.001(c) is wholly inapplicable here.

As for challenges to temporary orders issued pending a divorce appeal under Section 6.709, mandamus is available as an option, but it is not the only option. Unlike Section 109.001(c), Section 6.709 contains no explicit ban on "interlocutory" appeals. *See* TEX.FAM.CODE ANN. § 6.709 *et seq.* Instead, TEX.FAM.CODE ANN. § 6.709(b) simply provides that "[t]he trial court retains jurisdiction to enforce a temporary order under this section *unless the appellate court, on a proper showing, supersedes the trial court's order.*" [Emphasis added]. Several of our sister courts, including the Fort Worth Court of Appeals whose precedent we apply in this case, have read Section 6.709(b) as vesting the appellate courts with the power to review the validity of ancillary Section 6.709 temporary orders concurrent with the underlying appeal from a final divorce decree. *See Halleman v. Halleman*, 379 S.W.3d 443, 455 (Tex.App.--Fort Worth 2012, no pet.); *In re Merriam*, 228 S.W.3d 413, 416 (Tex.App.--Beaumont 2007, orig. proceeding); *In re Marriage of Edwards*, No. 06-12-00016-CV, 2012 WL 4503413, at \*10 n.28 (Tex.App.--Texarkana Oct. 2, 2012, no pet.)(mem. op.). As such, we have jurisdiction to

20

consider Michael's arguments related to the ancillary temporary order concurrently with his attack on the final judgment in this proceeding.

### *Do the Family Code Temporary Order Provisions Apply to Bills of Review?*

As another gateway matter, we must also address Michael's contention that the trial court lacked the authority to lodge the temporary order *ab initio* because Section 6.709(a) only applies to original divorce proceedings and not suits for bills of review. If this is true, our analysis ends there.

Michael correctly notes that "a bill of review is a separate proceeding from the underlying suit . . . ." *Ross v. Nat'l Ctr. for the Emp't of the Disabled*, 197 S.W.3d 795, 798 (Tex. 2006). He also argues that the purpose of the temporary orders statute is to allow the trial court to preserve community property and protect the parties pending appeal, neither of which are considerations at bar, since the community estate no longer exists as a result of the divorce and because Angela made no showing that the temporary order was necessary for her protection on appeal. Angela counters that the plain language of Section 6.709(a) does not preclude its application to bills of review. This issue is apparently one of first impression.

We agree with Michael that, under these facts, the trial court lacked the authority to enter the temporary order. Section 6.709's position within Title 1, Subtitle C, Chapter 6 of the Family Code—titled "Suit for Dissolution of Marriage"—makes clear that the provision applies only to suits for dissolution of marriage, i.e, divorces. Here, because the bill of review did not seek to initiate divorce proceedings *per se* but instead only attempted by separate suit to unsuccessfully attack the validity of a final, unappealable judgment, *see Ross*, 197 S.W.3d at 798, Section 6.709 does not apply because there was never an actual divorce proceeding before the trial court at the time of judgment.

21

We emphasize that our decision on this point hinges on the unusual procedural posture of this case. Angela argues in her brief that we should allow the trial court's temporary order to stand because "if Mike were successful [on appeal], he would re-open the entire divorce proceedings, thereby allowing a re-divi[si]on of the parties' property, and a re-consideration of all provisions regarding the parties' children." That is not the case. Michael's success in this appeal means only that the summary judgment in her favor is reversed and the case remanded for further proceedings. The divorce decree stands undisturbed unless and until Michael can satisfy the fact finder that he is entitled to a bill of review at a merits hearing. *See State v. Buentello*, 800 S.W.2d 320 (Tex.App.--Corpus Christi 1990, no writ)(noting that the rights, liabilities, and status of the parties under the judgment are not affected by an unsuccessful bill of review).

Angela's argument is well-taken, and we do not foreclose on the possibility that a party could obtain temporary orders under Section 6.709 where a bill of review is *granted* and a divorce is reopened. In that situation, the two causes merge together, the divorce decree is overturned, litigation resumes, and appeal of the bill of review would necessarily implicate a suit for the dissolution of marriage. *See Valdez v. Hollenbeck*, 410 S.W.3d 1, 9 (Tex.App.--San Antonio 2013, pet. granted), *reversed on other grounds*, 465 S.W.3d 217 (Tex. 2015)(noting that a bill of review grant reverts the parties "to their original status as plaintiff and defendant with the burden on the original plaintiff to prove the underlying cause of action"). But that is not the situation at bar. Here, because the bill of review was not granted, the divorce proceedings were never technically reopened, the final judgment was left untouched and unappealable, and the status quo between the parties never actually changed. Absent an appealable divorce judgment, the trial court has no power to issue ancillary orders pending appeal under Section 6.709.

In sum, because the trial court denied Michael's bill of review, the final divorce decree

22

was left undisturbed and renewed divorce proceedings never took place. As such, the trial court had no power to issue temporary orders incident to divorce under Section 6.709.

Issue Four is sustained.

## CONCLUSION

We vacate the trial court's temporary orders awarding attorney's fees. The judgment of the trial court is reversed and the case remanded for further proceedings consistent with this opinion.

April 8, 2016

YVONNE T. RODRIGUEZ, Justice

Before Rodriguez, J., Hughes, J., and Larsen, Senior Judge
Larsen, Senior Judge (Sitting by Assignment)